All right. The next case for this morning is Tarleton v. Secretary of the Florida Department of Corrections. And we'll hear first from Counsel for Appellant. Yes, good morning. My name is Attorney Ann Morgetti. I represent Marvin Tarleton. I was appointed to help him on the questions that were the certificate of appealability. He was charged with robbing a bank on November 16, 2009 in Jacksonville. He was represented by the public defender. He actually had two public defenders, Nathan Carter and Nicholas Thomas. He went to jury trial on February 3, 2011. It was a very short trial. And during that trial, there were four witnesses that did testify. And there were the police officer, the detective that was in charge, testified regarding four witnesses that did not testify. The crime stopper's tip, the appellant's brother, the appellant's brother's wife, and April Hoffman, who's a niece of the... Counsel, this is Robin Rosenbaum. I think you're all well-versed in the facts on this. And I think what it really comes down to is whether under AEDPA deference, the decisions of the state court, that there was no prejudice here, whether those decisions are entitled to deference or not. And I will tell you, I think it's close, but I think you have a steep hill to climb with AEDPA deference. And the problem here that I see is that even if we exclude all the troubling evidence, which I think we should, and even if we discount the evidence from, say, the teller who expressed some ambivalence about whether she thought that your client had committed the robbery, we still have the positive identifications from his ex-wife and his niece, Ashley, and we have the videos of the robbery. So it's hard to say when we look with AEDPA deference that the error here would satisfy the Brecht standard or the Chapman standard, depending on whether we're looking at it from a confrontation clause point of view or a Strickland point of view. So I'd like you to address that, if you don't mind, please. Yes, Your Honor. First off, the teller did not identify Mr. Tollington. It was very troubling when I was reading the record, the way the questions were asked and the answers. She was looking at pictures. She never connected Tollington to the robber. So to say that her testimony was... I'm sorry. Even assuming that that's the case, even if we discount her testimony, we still have testimony, positive identifications from the ex-wife and the niece, Ashley. And I'm discounting the testimony from the stepmother because she clearly had an axe to grind. But even if we discount all of the problematic identifications, we still have two identifications that, at least on the face of the testimony, don't appear to have any significant issues. And we have the videos so the jury could review these matters itself. So I guess I need you to tell me why you think that that's not enough under ed-predeference, right, or that ed-predeference doesn't apply. Why isn't that enough? Because all these people did, the two that you're talking about, was they looked at photos and they looked at a video and they opined whether the person seen in the surveillance was Tollington. I would say that's arguably improper opinion evidence that they should not have been able to testify to, which they did testify to. There was nothing found in the search of the house. There was nothing found in the search of the vehicle that connected him. There was no other, there was no large purchases. So what you have, and the bias of those two, they were not close with him. They did not, they didn't want him to come to the house. I think that was the stepmother. But the niece that testified was able to say things that she shouldn't have even said. She was able to say that, in her opinion, he should go to prison. I mean, this was not a fair trial, and I think that's the ultimate factor that the court has to look at. Counsel, this is Robert Luck. I want to ask a similar question to the one Judge Rosenbaum asked, but maybe a little bit differently. Let's assume, and let's say that I, and I'm only speaking for myself, agree with you that the state habeas court got wrong, as a matter of fact, clearly and convincingly, that the teller ID'd your client. And so from that fact, what does that mean for ADIPA deference? Does the fact that the state habeas court relied on that fact in making its prejudice finding call that into question for ADIPA purposes, such that that's no longer a reasonable determination that it made, and therefore we look at it de novo? And if we were to look at it de novo, does that even change the analysis that Judge Rosenbaum asked about whether the evidence was in itself sufficient to find there was no reasonable probability of a different result? I agree with you, Your Honor. Well, I'm not sure I'm making a point. I'm merely asking a question. I honestly don't know the answer, and I'm asking your thoughts on it. When you look at the totality and the different tests, he clearly was prejudiced by, and they not only said it during the trial, they say it in closing argument that there was an identity. And without anything else, no fingerprints, no DNA, actually it excluded Tarlington. You cannot say that the result would not have been different had these people not been able to testify. Hello? We're still here. Oh, I'm sorry. This is not very... That's okay. Don't worry about it. Okay. I thought my phone was off. I apologize. This is Judge Anderson talking. Yes. Actually, I don't know whether my brother and sister were just asking questions or whether they really believe it, but I do not think we could fairly say, in light of the ed per deference, that the 3.850 judge was unreasonable in concluding that the teller did, in fact, identify Tarleton. She picked him out of the photo pack, and she said his eyes were what gave it away. It seems to me that it's not unreasonable to say that that is an identification. Where am I wrong? I believe you are wrong, Your Honor. Okay. What she did was she didn't identify the photo as Tarleton. She picked out differences in the photo. The testimony is disturbing, I believe. I mean, the man got 30 years for a crime he says he didn't commit. She said she didn't actually connect that photo to Tarleton. She said that that photo, the man was slimmer, and from the nose down, the bit was different. So she only pointed out differences. She didn't make an identity, Your Honor. And for those reasons, I ask that you reverse. Thank you, counsel. Thank you, counsel. And you've reserved five minutes for rebuttal. We'll hear next from Mr. Duffy. Thank you, Your Honor. May it please the Court, Thomas Duffy with the Florida Attorney General's Office on behalf of the Secretary. Judge Rosenbaum, I think you're correct. This case does boil down to prejudice or, in the Sixth Amendment context, harmless error. I think the Court is obviously well aware of the fact that several people, three people who knew him well identified him from photographs. Those are valid identifications. Counsel, I'm sorry to interrupt. This is Robin Rosenbaum. I have a couple of questions. Certainly. If you heard Judge Luck's question about whether Ed Pudge's deference applies, I would appreciate it if you would give us a response to that. Let's assume, just for purposes of this response, that the state court judge's finding that the teller definitely identified Carlton is wrong and that the state judge's conclusion that the evidence here was nearly overwhelming is wrong. In light of assuming that those two findings we conclude are clearly wrong and unreasonable, would we apply Ed Pudge's deference to the ultimate conclusion that there was no prejudice, or would we evaluate it to no vote? Well, we believe you should certainly apply Ed Pudge's deference. These were a decision on the merits, and I don't think it was factually unreasonable. The judge relied on... I'm sorry. I'm sorry, Counsel, to interrupt. I guess my question is, why do you think... What supports your conclusion that Ed Pudge's deference would still be appropriate if we also concluded that those other two factual findings were unreasonable and clearly wrong? I ask you to answer the question assuming that to be the case, so that's the hypothetical. Okay. Let me gather my thoughts. This is taking me a little bit by surprise. If you assume that they are factually unreasonable, if that's the assumption, is that what I'm hearing? Is that correct, that you're saying that the decisions are factually unreasonable? Yes. Okay. Okay. In that case, then I presume... Just the two conclusions. One, that the teller identified Tarleton, and two, that the evidence was, quote, nearly overwhelming. Okay. So the assumption is, for purposes of argument, that those two facts findings are unreasonable. Is that what I'm hearing? Yes. If those are unreasonable, then I think you certainly would fall out of Ed Pudge's deference, and you'd fall into de novo, but I don't think it matters, because I think even under a de novo standard, the evidence judged de novo would certainly support a very clear support for the jury's verdict in this case. The state's evidence was quite strong here. You had people who knew the defendant well, looking at pictures and going into granular detail about why they thought he was the person in the picture. The stepmother, and I might push back, I'm not sure she necessarily had an ax to grind there, but assuming that were the case, if you go to Denise, she looked at him and said that she had known him since she was a child, had lived in the same house with him at a time, recognized... But what about the fact that she said that he should go to prison? Well, this is the first time I'm hearing of this objection. Yeah, that was probably objectionable, but what would happen in that case is the jury would be told to disregard it, and we would have to presume that the jury found it. But counsel, I'm not asking you whether that in and of itself is objectionable. I guess my question is, how does that factor into the analysis of whether there was prejudice? Because, you know, if we look at the witnesses, and every witness has a problem, right? And on top of that, there was this evidence that came from the law enforcement officer, the agent who testified that brought in the other hearsay evidence that the problem that we all admit and agree is a problem. Then it becomes a closer question on prejudice, doesn't it? I mean, if all you're left with are identifications from people who were biased against him, then why doesn't the prejudice question become closer? Well, is that the presumption that the witnesses were biased? Because I saw no evidence of Ashley Hoffman. Right, so that's what I'm asking you, right? So this is hypothetical? No, if the niece... So opposing counsel just argued that the niece... I had asked whether, you know, even if we look at just the niece's testimony and the ex-wife's testimony and the videos, isn't that enough? And doesn't that require deference under AEDPA to the conclusion that there was no prejudice? She responded by saying, while the niece wasn't completely unbiased, she said that the defendant should go to jail, that he should go to prison. And so what I'm asking you is, doesn't that then change the calculus of what we're looking at in determining whether there was prejudice or not? Because now what we're left with is one witness who doesn't seem to have an axe to grind, who hasn't expressed something that clearly suggests in some way that there might be some prejudice or bias, and videos. That's what we're left with. And maybe that's enough. But I guess I'm just asking you to explain why you think it's enough. Well, certainly, I mean, let's assume that the jury disregarded all the testimony from Joyce Tarleton, Ashley Hoffman, Francesca Sweers, and Detective Ganache's testimony that's considered hearsay, and I'll get to that in a minute. They still had, and the state pointed them to it at the very beginning of the closing argument, look at the photographs, look at these photographs, compare them to what the teller said the person looked like, compare them to the other photographs that are in the record. They had a booking photo, and they had the stills from the surveillance video. And the jury actually asked a question about those photographs. So the jury was clearly focused on that. So even if you discount all that, it's still a very strong case for the state, even if they disregarded that. And like I said, I'm making this statement based on the assumption that you are discounting at least two of the three relative witnesses. Do I have that right? Yes, thank you, counsel. Yeah, okay. As to the alleged hearsay, let's look into that. I'm not sure the Crime Stoppers testimony, Detective Ganache was testifying in the context of how the investigation proceeded. And prosecutions tend to do that now that police procedurals are so popular in fiction and on television. So he went through this and went through all the people that he talked to, and he said he got two anonymous tips from Crime Stoppers. I don't see how that's prejudicial at all to the defense. One of them was actually helpful, because it was a man known as Whitberry who was investigated. And the defense used that in closing to buttress its case that the investigation was not well done. The defense also got out on cross-examination that Kimberly McClinton, who's another relative of the defendant, could not identify him. And two of the witnesses that they complained about, James Tarleton and his wife, that came out on cross-examination, not on direct examination by the state. And redirect testimony said that they thought it could be him, but there was no positive ID, and the defense relied on that. Turning to the Sixth Amendment claim, first we say it's not exhausted. We'll rely on the brief for that unless there's questions. Counsel, if I can just go back a little bit. So do I understand you to be saying that in determining the prejudice analysis, whether we're looking at it de novo or under a DIPA, on the other side of the scale, this hearsay evidence, one was a tip that indicated somebody else did it, not the defendant, and that was used by counsel in closing argument to argue that the defendant didn't do it. And the other one was solicited on cross. In other words, it was already before the jury when the government pointed it out, and was no better than that two people said it could possibly be or might be or may be the defendant. Is that what I hear you saying? That is what you heard me saying, Judge Lockett. Okay. But if we get to the Sixth Amendment case for harmless error, in Frye v. Pyler, I think it's pronounced, maybe Piller, this court set out five factors that would be relevant under Chapman. How the witness' testimony was to the prosecution, how important it was to the prosecution's case, whether it was cumulative, whether the presence or absence of evidence corroborating or contradicting the testimony, whether there was that sort of evidence, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. And our position is that the defense cannot, loses on all five of those categories. As we've argued, the evidence was quite strong. The jury was not out more than 90 minutes, and some of that was spent looking at, you know, asking a question for the court to answer. The hearsay, the one... Before you get off, but this is Judge Anderson, before you get off the Confrontation Clause issue, is it not true that our standard of review on habeas with respect to the Confrontation Clause error was Brecht harmlessness and not Chapman harmless beyond reasonable doubt? I don't think it's beyond a reasonable doubt. I think since Frye v. Pyler came out, Brecht v. Abramson came out, which is also an edpa case. Good morning. Thank you. But what I understood at the beginning was that perhaps the Chapman standard should apply. But even if you apply those factors to get to Chapman... I thought Frye in the spring court made it pretty clear that the Brecht standard applied and not harmless beyond reasonable doubt. That was certainly my impression going into the oral argument, Your Honor. Do you have a different impression now? Well, I have the impression that I had when I came in. Let's just say that. All right. If that makes sense. The only real hearsay evidence we contend was from April Hoffman, who identified a detective that I said, but didn't sign the photos, didn't want to get involved. Her testimony on identification is four lines of type, and there were six lines of type in the closing about her. So that did not become a feature of the case. If there are no more questions, we ask that you affirm the lower court. Thank you. Thank you, counsel. We'll hear again from Ms. Borgetti. Yes, thank you. The whole feature of the case, of the state's case, was that nobody knows you best but your family. And so they hit that point on, I believe, opening during the trial and in their closing statement. And as to the tips, police officers normally say they acted upon the tips, but this time, this police officer actually said what the tip was, providing the two different names, and he also testified that the crime stopper's tip provided the address that he went to where he saw Tarlington at that address. So, I mean, he was clearly prejudiced. This isn't even a close question. Counsel, this is Robert Lux. Counsel, this is Robert Lux. On the no one knows you like your family does, that's a bit of a two-edged sword for prejudice purposes, is it not? Because defense counsel made a lot of use of the fact that some pretty close family members could not positively ID him. For example, his sister, who did not have an axe to grind and who, in fact, gave him an alibi, and then the brother and sister-in-law could not positively ID him, and that that was, in fact, brought out in cross-examination. But, in other words, the state didn't even bring it out on its own. The jury had already heard it by the time the state did that. I just have a hard time understanding how that argument wasn't exactly the defense that was brought out here about he didn't do it, and we know he didn't do it because his close family members are looking at him, the ones who don't have an axe to grind, and say it's not him. Well, I don't believe that this public defender had a cohesive, flowing argument. His performance was reasonably ineffective. He had filed a, and this is a little off the road here, but he filed an alibi. Maybe we shouldn't go there if it's a little off the road. Okay. If you could just respond on the prejudice side of it, it just doesn't seem that if we're looking at prejudice, it's sort of the same things you're talking about actually really help the defense here and were highlights of the defense closing argument for why the defendant didn't do it. I don't believe that they helped the defense at all. And I'm just going to stand on my brief. All right. Thank you, counsel. And Ms. Borghetti, I know that you were court appointed. I want to thank you for taking the representation and for doing a very good job. All right.